IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FELIX MEDINA, *Plaintiff,* v. MENASHA PACKAGING CO., *Defendants.* | CIVIL ACTION NO. 23-4956 |

**Pappert, J.**                                                                          **October 7, 2024**

## MEMORANDUM

    Felix Medina, Jr., a Hispanic man, worked for the Menasha Packaging Company for roughly twenty-three years, serving initially as "general help" and working his way up to production supervisor. He was a generally knowledgeable and skilled employee but throughout his time with the company ran afoul of policies governing attendance and hours of work. He also exhibited aggressive, intemperate and erratic behavior. He was issued several warnings over the years and even served a three-day suspension. In both 2018 and 2019, he was placed on performance improvement plans for behavioral issues and was subsequently counseled on his penchant for getting to work late and leaving early. These problems continued into the spring of 2022, when he again reported late to work.

    That summer, Medina's supervisor Domenic Santone met with Medina to discuss attendance and tardiness issues, which Medina pledged to correct. But the problems continued into the fall. On December 5, Santone and Human Resources Representative Jennifer Friedman met with all production supervisors, including Medina, to reiterate the importance of reporting to work on time for their shifts and fulfilling their job

responsibilities. Just days after this meeting, Medina left work early without permission and arrived late the following day. He did the same thing the following week, leading the general manager, Nathan Timmons, to decide that Medina needed a "final written warning".

On December 20, Santone and Friedman held a meeting with Medina, the purpose of which was to communicate to him the final warning for his attendance violations coming out of the December 5 meeting. The meeting did not go well. Medina talked over Santone, shouted obscenities at him and then stood up, wheeled around and punched his fist through the conference room wall. All within roughly three minutes. Medina, knowing he went too far and that he did something for which he could be fired, agreed to be escorted out of the building. He subsequently texted Friedman and Timmons apologizing and seeking to keep his job. But the damage, literally and figuratively, was done. Two days later, the company's western Pennsylvania-based Vice President of Sales and Operations made the decision to fire Medina after getting an accounting of the incident from a shell-shocked Friedman and looking at a picture of the newly ventilated wall.

So Medina knew screaming obscenities at his boss and putting his fist through the wall in front of the boss and someone from HR could get him fired and knew why he lost his job. No other reason. Despite knowing all this, and likely knowing that he *should* have been fired for what he did, he found a lawyer and filed this lawsuit. And boy did he lay it on thick. Although he had never alleged during his time with Menasha that he or any of his Hispanic co-workers were subjected to mistreatment on account of their race, he now claimed Menasha discriminated against him because he is Hispanic.

Because he apparently vomits a lot when he gets sick, he claimed (absent any such diagnosis) to have a disability called cyclic vomiting syndrome and that he was discriminated and retaliated against under the Americans with Disabilities Act and retaliated against as well under the Family and Medical Leave Act.

Menasha sought summary judgment on all claims. The Court heard oral argument on the motion, during which Medina's counsel, acknowledging that discovery rendered the ADA and FMLA claims illusory, withdrew all but the racial discrimination claim.[1] But that claim, at the end of the day as specious as the others, should have also been withdrawn. The Court grants what remains of the motion and enters judgment for Menasha.

I

Medina began working for Triangular Container Corporation in 1998. (Medina Dep. at 221:5-6, ECF No. 20-9.) In 1999, Menasha Packaging Company acquired Triangular and hired its employees, including Medina. (Decl. of Jennifer Friedman at ¶ 2, ECF No. 20-10.) Medina cycled through several positions on the factory floor until 2011, when he was promoted to production supervisor. (Medina Dep. at 59-60); (Promotion Letter, ECF No. 20-16.) Menasha viewed Medina as a knowledgeable employee, possessing technical skill and the ability to grow. (Nathan Timmons Dep. at 15:19-20, ECF No. 21-6); (Domenic Santone Dep. at 34:18-21, 35:9, ECF No. 21-4.)

At Menasha, six production supervisors are split among three shifts, with two working one shift at a time. (Santone Dep. at 20:12-14, 14:8-11, 14:3-16.) For six years, Medina and Domenic Santone both worked as production supervisors, and they got

---

[1] *See* (Oral Argument at 64:1-15, 71:7-20, 72:6-7).

3

along with one another.  (Medina Dep. at 72:19-23, 73:2-7); (Santone Dep. at 11:9-11.)  In 2019, Santone was promoted to plant manager, becoming Medina's direct supervisor.  (Medina Dep. at 72:1-5.)  Roughly half of the employees who directly report to Santone are Hispanic, including two other production supervisors.  (Santone Decl. at 3, ECF No. 20-17.)

      Notwithstanding his other positive attributes, Medina routinely had unexcused absences from work.  Menasha handled employee misconduct, including tardiness, via the following progressive disciplinary system: (1) verbal warning, (2) written warning, (3) suspension for a number of days, (4) final warning, and (5) termination.  *See, e.g.*, (Termination Letter at 2, ECF No. 20-35).  Over the course of his time with the company, Medina was issued three verbal warnings, two written warnings, a three-day suspension and two final written warnings.  (First Offense 1999, ECF No. 20-11); (Second Offense 2003, ECF No. 20-12); (Final Warning 2003, ECF No. 20-13); (First Offense 2006, ECF No. 20-14); (Final Written Warning, ECF No. 20-36); (First and Second Offense 2009, ECF No. 20-15.)  In 2018, General Manager Nathan Timmons placed Medina on a performance improvement plan ("PIP") due to his unexcused absences.  (2018 PIP, ECF No. 20-21.)  Medina also had a history of "aggressive or unprofessional" conduct towards other employees.  (2019 PIP at 2.)  In one instance, he "aggressively raised his voice and threw paperwork onto a desk."  (2019 PIP at 3.)  In another, an employee accused him of being "aggressive and erratic."  (Harassment Complaint at 2, ECF No. 20-19); (Timmons E-mail at 2, ECF No. 20-20.)  In 2019, Timmons placed Medina on another PIP for aggressive conduct towards subordinates.

4

(2019 PIP.)  Human Resources Representative Jennifer Friedman was aware of these incidents and accusations.  (Timmons E-mail at 2); (Friedman Dep. at 47:2-22.)

Medina became increasingly frustrated with Menasha's disciplinary measures. Between 2019 and 2022, he repeatedly complained to Friedman about Santone's purported "unfair" treatment.  (Medina Dep. at 213:11-13, 244:19-24); (Friedman Dep. at 49:12-50:21.)  In one of these meetings, Medina told her that Santone is a "dickhead" and that he would "like to kill him."  (Friedman Dep. at 49:12-50:21.)  In November of 2022, Medina also complained to Timmons.  (Medina Dep. at 241:1-3.)  He never suggested to Friedman or Timmons that his treatment was racially motivated, (Friedman Decl. at 3), rather that he was frustrated by Santone's attempt to discipline him for his unexcused absences.  (Timmons Dep. at 23:21-25, 24:1-4.)

On December 5, 2022, Santone and Friedman held a meeting with all six production supervisors to "reset" performance and attendance expectations.  (Medina Dep. at 163:15-21, 164:8-14); (Timmons Dep. at 28:23-29:3); (Santone Dep. at 51:22-24); (Termination Letter at 2.)  But between December 5 and December 18, Medina worked less than his full shift several times.  (Final Written Warning, ECF No. 20-36.)  As a result, Timmons and Santone drafted a final written warning and scheduled a meeting for December 20 so Santone and Friedman could issue it to Medina.  (Timmons Dep. at 26:17-27:14, 33:1-9); (Friedman Dep. at 60:5-24, 61:1-17); (Termination Letter, ECF No. 20-38.)[2]

---

[2] At his deposition, Medina disputed that he was late on some, but not all, of the dates and times cited in the final written warning. (Medina Dep. at 176:2-6, 229:17-24.) Whether or not he was actually late on these dates is beside the point—Medina's tardiness issues are only relevant as context for why he was issued his final written warning, which was the subject of the fateful December 20, 2022 meeting.

Roughly three minutes into the meeting, Medina lost his temper, yelled expletives at Santone, talked over Friedman and Santone and then stood up and punched his fist through the conference room wall. (Termination Letter at 3, ECF No. 20-38); (Friedman E-mail, ECF No. 20-43); (Medina Dep. at 181:6-10); (Photograph of Hole, ECF No. 20-39.) At that point, Santone and Friedman feared for their physical safety, as did several other employees in the vicinity. (Friedman E-mail); (Clawson Decl. at ¶ 7, ECF No. 20-44); (Friedman Dep. at 49:1-7, 68:16-19); (Santone Dep. at 61:17-24, 62:1-5.) One employee heard the commotion, locked her door and hid in her office. (Friedman Dep. at 69:1-9.) Another, Wayman Reid, approached the conference room to see what was happening. (Friedman E-mail.) Medina knew right away that what he did was a terminable offense, which is "why [he] walked away after [he] punched it." (Medina Dep. at 181:6-21.) Now crying, Friedman asked Medina to leave, and Reid escorted him out of building. (Friedman Dep. at 68:7-9, 68:20-22.) In the days that followed, Medina texted Friedman and Timmons apologizing and asking to keep his job. (Text to Friedman, ECF No. 20-41); (Text to Timmons, ECF No. 20-42.)

After the meeting, Friedman e-mailed witness accounts to Senior Human Resources Business Partner Beverly Stonick, Vice President of Sales and Operations Greg Clawson, Santone and Timmons. (Friedman E-mail.) The e-mail included her and Santone's joint report along with the accounts of two employees outside the conference room who overheard the incident. (*Id.*) Clawson had a phone call with Stonick, Santone and Friedman to discuss the details of the meeting. (Clawson Decl. ¶ 5.) Upon hearing that Medina had "engaged in a violent act" and viewing the photograph of the damage to the wall, Clawson fired Medina on December 22. (Decl. of

Greg Clawson ¶¶ 2, 6-9); (Termination Letter at 2); (Medina Dep. at 195:14-17, 186:11-15); (Oral Argument at 4:21-5:25, ECF No. 28); (Photograph of Hole.)  Santone did not participate in Clawson's decision to fire Medina.  (Santone Dep. at 64:13-16.)  Clawson and Stonick both worked in Menasha's western Pennsylvania location and neither one of them knew Medina or knew that he was Hispanic.  (Timmons Dep. at 10:23-25); (Oral Argument at 5:3-14); (Medina Dep. at 262:2-4); (Clawson Decl. at 3.)  After Medina's termination, Menasha hired two new production supervisors—Tayrn Burnett, who is black, and Jose Aviles Vega, Jr., who is Hispanic.  (Friedman Decl. at 3, ECF No. 20-10.)

At the time of his termination, Medina was working the first shift, which ran from 6:30 a.m. to 3:30 p.m.  (Medina Dep. at 148:21-22); (Timmons Dep. at 34:4-8); (Santone Dep. at 37:11-14, 47:19-20.)  He worked this shift with fellow production supervisor Michael Ventura, who is white. (Santone Dep. at 39:1-9); (Timmons Dep. at 34:1-3.)  Medina believed Santone treated him "unfairly" in comparison to Ventura, but never attributed such alleged treatment to his race.  (Medina Dep. at 221:13-22.)  Like Medina, Ventura also had unexcused absences, for which he was issued a verbal warning on June 4, 2021 and a written warning on May 24, 2022.  (Ventura Verbal Warning, ECF No. 21-7); (Ventura Written Warning, ECF No. 21-8.)  Ventura was never placed on a PIP, suspended or issued a final written warning.  Medina also claims Ventura punched Santone's computer monitor in front of him and Santone, but aside from Medina's accusation, there is no record evidence which could show Ventura ever did such a thing, including that Santone could not even remember that happening. (Medina Dep. at 205:5-12); (Santone Dep. at 64:6-12.)

7

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount*

*Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001).  Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III

There is no evidence in the record—none—upon which a reasonable jury could find that Medina was discriminated against because of his race in violation of Title VII and the PHRA.[3]  Medina admits that putting his fist through a wall in a meeting with his boss and someone from HR merited his termination.  But he argues now that he was fired because he is Hispanic.  He relies solely on the theory that Michael Ventura is a similarly situated comparator and should have also been fired for punching a company-owned computer.  Actually, his theory is much less straightforward.  Because Santone, the purported discriminatory actor, was not the one who fired him, Medina contends that Santone had an affirmative duty to inform Greg Clawson of Ventura's computer-punching incident prior to Clawson's decision to fire Medina.  Santone's failure to do so, in Medina's view, influenced Clawson's decision to terminate him, resulting in racially disparate treatment.  But the record, if anything, contradicts his unsupported claim and, in any event, no reasonable jury could find that what Ventura purportedly did was similar to Medina's violent outburst.

The Court's inquiry is governed by the burden shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  Under this analysis, the

---

[3]      Title VII and PHRA discrimination claims are analyzed under the same framework and the Court considers them together.  *Rosencrans v. Quixote Enters.*, 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff succeeds, the defendant has the "relatively light" burden "to articulate some legitimate, non-discriminatory reason" for the termination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802)). The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is mere pretext. *Id.* at 764. Medina fails to establish a *prima facie* case, but even if he could, Menasha's legitimate, nondiscriminatory reason for firing him is not pretextual.

### A

To establish a *prima facie* case of race discrimination, Medina must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Here, the first three elements are undisputed. (Def. Mot. for Summary Judg. At 3, ECF No. 20-1.) Plaintiff is Hispanic, (Medina Dep. at 221:5-6), he was qualified for his production supervisor position, (Timmons Dep. at 15:19-20); (Santone Dep. at 34:18-21), and he was terminated from his employment, (Termination Letter.) At issue is whether there are any facts in the record that could allow a reasonable jury to infer that Medina was fired because of his race.

A plaintiff may raise an inference of discrimination in various ways, including by direct evidence of racial animus such as a supervisor's discriminatory statements, similar racial discrimination against other employees, or evidence that similarly

10

situated comparators were treated more favorably by the employer. *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010). A plaintiff may also raise an inference of discrimination by alleging that he was replaced by an individual outside of his protected class. *See Lazard v. All Restore, LLC*, No. 19-6040, 2021 WL 1175137, at *7 (E.D. Pa. Mar. 29, 2021) (citing *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007)).

A similarly situated comparator need not be identically situated, but must be similar in "all relevant respects." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp.3d 571, 589 (E.D. Pa. 2017) (citing *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009)). In other words, the plaintiff must show that his employment situation was "nearly identical" to those of the co-workers he alleges were treated more favorably. *Id.* (citing *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp.2d 206, 214 (E.D. Pa. 2010)). Thus, employees are similarly situated when they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223. A plaintiff must show the other employee's acts were of "comparable seriousness" to his own infraction. *See Anderson v. Haverford College,* 868 F. Supp. 741, 745 (E.D. Pa. 1994). The relevance of certain facts or circumstances for the purposes of the "similarly-situated" analysis is determined by the context of each case. *Collins*, 247 F. Supp.3d at 590.

1

Medina's race discrimination claim is wholly unsupported by the record—there is no evidence that Greg Clawson's decision to fire Medina had anything to do with his race. Medina cites no direct evidence of racial discrimination, no racially insensitive statements towards him by anyone, and no similar racial discrimination against the many other Hispanic employees at Menasha. He relies solely on the theory that Mike Ventura, a white production supervisor, engaged in similar conduct but was not fired. (Oral Argument at 38:18-39:5, 39:17-40:13); (Medina Resp. to Mot. for Summ. J. at 6, ECF No. 21); (Medina Dep. at 205:13-24.) Specifically, Medina claims that Ventura is a similarly situated comparator because: (1) Medina and Ventura worked the same job and the same shift, (Santone Dep. at 39:1-9); (Timmons Dep. at 34:1-3), (2) Ventura also had unexcused absences, (Ventura Verbal Warning); (Ventura Written Warning), and (3) Ventura "punched a computer" in front of Medina and Santone. (Medina Dep. at 198:14-23.) According to Medina, Ventura destroyed company property when he struck the computer monitor, just like he did when he put his fist through the wall while yelling and cursing his boss out. (Medina Resp. to Mot. for Summ. J. at 6.) And the fact that Ventura was not terminated is enough, in his view, to raise a reasonable inference of discrimination.

No reasonable jury would equate these two incidents. To start, Medina admits that punching the wall, and not his unexcused absences, was the reason for his termination. (Medina Dep. at 195:14-17.) So Ventura's unexcused absences, which were less serious and pervasive than Medina's anyway, are not relevant. More importantly, the only "evidence" in the record that Ventura damaged a computer is

Medina's own deposition testimony.  But "unsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment." *Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015); *see also Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) ("[S]ummary judgment is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence." (internal quotation marks and emphasis omitted)); *Melendez v. Penn Internal Med.*, No. 23-786, 2023 WL 8548663, at *12 (E.D. Pa. Dec. 11, 2023) (granting summary judgment on discrimination claim where the only evidence of the plaintiff's alleged discriminatory treatment was in her unsupported deposition testimony).  Nothing in the record supports Medina's belated argument; if anything, the evidence contradicts it.  Santone recalls no such thing.  (Santone Dep. at 64:6-12.)  Ventura was never deposed.  There is nothing to document Ventura's alleged property destruction—no incident reports, photos of a damaged computer or physical evidence of any kind.  And Medina acknowledged that, although he would have been obligated to report the incident, he did not do so.  (Medina Dep. at 197:18-24; 198:1-7.)

2

Even if the jurors had a basis to find that Ventura punched his computer, they could not conclude that Ventura's conduct was remotely similar to Medina's.  Again, a Title VII comparator must have engaged in acts of "comparable seriousness" without any "differentiating or mitigating circumstances" that makes their conduct less severe.  *Anderson*, 868 F. Supp. at 745; *Opsatnik*, 335 F. App'x at 223.  In *Dunlap v. Hospitality*, the court held that two cases of violent conduct were not of comparable seriousness

13

because of differentiating circumstances, including the plaintiff's more aggressive behavior and his use of profanity and threats. No. 08-2019, 2009 WL 737372, at *17-20 (E.D. Pa. Mar. 18, 2009). Like the plaintiff in *Dunlap*, Medina relies on a "general analysis" of the two purported occurrences—describing them simply as "destruction of company property"—without properly considering their differentiating circumstances.

Medina had a history of "aggressive or unprofessional" conduct towards other employees. (2019 PIP at 2.) One employee accused him of being "aggressive and erratic." (Harassment Complaint at 2, ECF No. 20-19); (Timmons E-mail at 2, ECF No. 20-20.) Medina had shown increasing frustration towards Santone, at one point telling Friedman he wanted to "kill" him. (Friedman Dep. at 49:12-50:21.)

Friedman was aware of these incidents and accusations at the time of the December 20 meeting. (Timmons E-mail at 2); (Friedman Dep. at 47:2-22.) The meeting lasted only three minutes because Medina yelled over Santone and shouted obscenities at him. (*Id.*); (Friedman E-mail, ECF No. 20-43.) Then, Medina stood up, turned around and punched a hole in the conference room wall. (Termination Letter at 3); (Medina Dep. at 181:6-10); (Photograph of Hole.)[4] Santone was "startled, shocked, and just concerned about our own safety." (Santone Dep. at 61.) Friedman described herself as being "frantic," wondering where "could I hide" and whether there would be "continued violence." (Friedman Dep. at 49:2-7, 50:1-9, 67:19-23.) A newly hired

---

[4] At oral argument, Medina's counsel argued his conduct was not harassment or intimidation because Medina had turned away from Friedman and Santone before punching the wall. (Oral Argument 48:1-20); (Santone Dep. 61:1-7.) But that does not minimize the seriousness of the conduct or call into question the reasonableness of Friedman or Santone's fearful reaction. Medina's prior threats to harm Santone, his offensive language directed at Santone and Friedman, and his overt act of physical aggression would have placed any reasonable person in apprehension of imminent physical harm.

employee outside the conference room heard the commotion, closed her door and hid in her office. (Friedman E-mail); (Friedman Dep. at 69:1-5.) Wayman Reid, Menasha's shipping manager, heard screaming coming from the conference room and went to see what was happening. (Friedman E-mail.) Friedman started crying and told Medina to leave. (Friedman Dep. at 14-17.) Medina immediately knew his actions constituted a terminable offense and allowed Reid to escort him out of building. (Friedman Dep. at 68:7-9, 68:20-22); (Medina Dep. at 181:6-21.) In the next few days, Medina texted both Friedman and Timmons apologizing and asking to keep his job. (Text to Friedman, ECF No. 20-41); (Text to Timmons, ECF No. 20-42.)

Medina's admitted conduct was far worse, more extreme and potentially dangerous than Ventura's alleged "destruction of company property." (Medina Resp. to Mot. for Summ. J. at 1.) It was frightening and violent conduct in response to concerns raised by his direct superior and a human resources employee about Medina's attendance. Santone and Friedman rightfully feared for their physical safety, as did others who were not even in the room but heard Medina's explosion. Medina himself knew he had crossed the line and agreed to leave the premises, knowing he would likely lose his job. Even in Medina's self-serving account of Ventura's alleged conduct, Ventura didn't yell or curse at his boss or anyone from HR nor instill legitimate fear in any of his co-workers. A jury could not reasonably conclude that Ventura's conduct was of comparable seriousness to Medina's.

3

Even if Ventura and Medina were comparators under Title VII, there is no evidence in the record that Santone, who purportedly treated Medina differently

15

because he is Hispanic, influenced or participated in Clawson's decision to fire Medina. Generally, a Title VII plaintiff must show discriminatory animus on the part of the person who made the employment decision. *See generally Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). Absent such a showing, a plaintiff may rely on the "cat's paw" theory of liability, under which the employer may still be liable if the "decisionmaker who is himself free of discriminatory animus, [was] influenced by other employees who are motivated by discriminatory animus." *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 731 (E.D. Pa. 2014). The employee with the discriminatory animus must have "influenced or participated in the decision to terminate." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). Further, the employee must have been "motivated by hostility" and his actions must have been "*designed and intended* to produce the adverse action." *Staub*, 562 U.S. at 420 (emphasis in original).

Medina's race discrimination claim hinges on the theory that Ventura's alleged conduct was similar to his but that Santone never told Clawson that Ventura deserved to be fired too—all because Ventura was white. (Medina Dep. at 221:13-22); (Oral Argument at 52:20-24.) Medina does not expressly rely on a cat's paw theory of liability, but the Court can make quick work of it anyway. Medina concedes that (1) Santone did not make the decision to fire him, (2) Santone did not directly participate in Clawson's decision to fire him and (3) Santone did not directly recommend to Clawson that he do so. (Oral Argument at 79:1-16); (Medina Dep. at 186:11-15, ECF No. 20-9.)[5]

---

[5] At first, Medina tried to argue that Santone indirectly influenced the firing decision by "actively . . . participating in the investigation [by] providing information" to Friedman, who provided information to Stonick and Clawson. (Oral Argument at 52:15-24.) The record shows: (1) Friedman sent an e-mail, copying Santone, that included a "joint statement" from both of them

At bottom, Medina rests his case on an awfully thin reed: He posits that, knowing he would likely be fired (for something he admits he could be fired for), Santone had an affirmative duty to tell Clawson that a white production supervisor had once engaged in "similar conduct" but was not fired. (Oral Argument at 89:6-18.) Medina suggests that supervisors are obligated to "report incidences of workplace violence and aggression in the workplace." (Oral Arg. at 89:15-16.) He points to the "Menasha Anti-Discrimination/Harassment and/or Intimidation in the Workplace" Policy, which states that "[s]upervisory personnel who are aware of discrimination or harassment but fail to promptly report it to the Vice President of Human Resources may be subject to appropriate disciplinary action, up to and including termination." (Workplace Intimidation Policy at 6, ECF No. 20-6.)

There are several problems with this theory. To start, Medina points to no case law in which a court adopted such analysis. But even if the theory were viable as a matter of law, Medina's claim is unsupported by the record. There are no facts in the record that show Santone made the "affirmative decision" to stay silent about Ventura with the specific intent to influence Clawson's decision to fire Medina. *See Staub*, 562 U.S. at 420. On the contrary, the record shows Santone did not report what Ventura did because he never remembered it even happening. (Santone Dep. at 64:6-12.) The

---

describing what happened, (Friedman E-mail), (2) Clawson had a phone call with Friedman, Santone and Stonick about the event, (Clawson Decl. ¶ 5), (3) Santone testified that he had no role in the termination decision, (Santone Dep. at 64:13-16), and (4) Santone testified that he first heard of Medina's termination from Timmons after the fact. (Santone Dep. at 64:17-20.)

Although Santone was on the call arranged by Clawson, a reasonable jury still could not conclude on these facts that he influenced Clawson's decision in any way. Medina's counsel admitted as much, (Oral Argument at 83:6-16), forcing him to rely on a novel theory of causation.

Medina's counsel also pointed to the termination letter, which Santone signed, as evidence of his input into Clawson's decision. (Oral Argument at 85:23-87:12.) But the termination letter was drafted after Clawson decided to fire Medina.

Workplace Harassment Policy does not require an employee to report an incident if he does not feel endangered. (Workplace Intimidation Policy at 4.) Because he could not recall such an incident, Santone did not file such a report, (Santone Dep. 64:6-12), and there is no other evidence that Santone or Medina felt intimidated or threatened by Ventura's purported actions.

Even if a jury could possibly find, consistent with the law, that Santone "influenced" Clawson's decision to fire Medina by not seeking Clawson out and volunteering the information that Ventura had struck a computer monitor, there is nothing to show Santone's inaction was "motivated by discriminatory animus." *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 731 (E.D. Pa. 2014). To start, while Medina complained to Friedman and Timmons about Santone's purported unfair treatment of him, he never suggested that treatment had anything to do with his race. (Medina Dep. at 213:11-13, 221:13-20, 241:1-14, 244:19-24); (Friedman Dep. at 49:12-50:21); (Friedman Decl. at 3.) Nor does Medina point to any evidence that Santone treated other Hispanic employees differently because of their race, even though roughly half of Santone's direct reports were Hispanic. (Santone Decl. at 3.) Indeed, one of Medina's replacements was Hispanic, (Friedman Decl. at 3), which further undermines his claim. *See, e.g.*, *Boice v. SEPTA*, No. 05-4772, 2007 WL 2916188, at *11 (E.D. Pa. Oct. 5, 2007). And Medina acknowledged that for six years he and Santone had a productive working relationship, which soured only when Santone "got power," i.e., became his direct supervisor. (Medina Dep. at 323:9-24.)

B

Even if Medina could make out a *prima facie* case, Menasha articulated a legitimate, non-discriminatory reason for his termination. A defendant satisfies its burden to show a legitimate, nondiscriminatory reason for alleged discrimination "by introducing evidence, which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable [action]." *Branch v. Temple University*, 554 F. Supp.3d 642, 649 (E.D. Pa. 2021) (internal quotation marks omitted). The defendant does not need to prove the offered reason was the actual reason for its decision. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010). Medina rose his voice, cursed at his boss and punched a hole in a conference room wall, with a representative from human resources present. He caused Friedman, Santone and several others to fear for their physical safety. (Def. Mot. for Summ. J. at 12.) He admits his behavior was a terminable offense and that it was the actual reason for his termination. (Medina Resp. to SUMF ¶ 157, ECF No. 21-2.) If an employer ever had a legitimate, nondiscriminatory reason to fire someone, this is the case.

C

The burden shifts back to Medina to prove that that reason is mere pretext for racial discrimination. A plaintiff can show pretext by pointing to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764–65. "The plaintiff cannot simply show the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise,

19

shrewd, prudent or competent." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). Instead, the plaintiff "must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fennell v. Comcast Cable Commc'ns Mgmt., LLC*, 628 F. Supp. 3d 554, 580 (E.D. Pa. 2022) (quoting *Fuentes* 32 F.3d at 765).

As evidence of pretext, Medina relies again on the argument that he was fired while Ventura was not. (Oral Argument at 73:16-24.) For the reasons previously discussed, *see infra* Section III.A.3, the record lacks any evidence from which a jury could reasonably infer that Santone was influenced by racial animus in failing to report Ventura's prior conduct; there is no evidence that firing Medina for punching a hole in a wall was pretext for racial discrimination.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
Gerald J. Pappert, J.